UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY MEZZACAPPA,                                   :

               Plaintiff,                       :            10 Civ. 0218 (AJP)

         -against-                               :            **OPINION AND ORDER**

MICHAEL J. ASTRUE, Commissioner of          :
Social Security,
                               :
              Defendant.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Anthony Mezzacappa, represented by counsel, brings this action pursuant

to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision

of the Commissioner of Social Security ("the Commissioner") denying Mezzacappa Disability

Insurance Benefits.  (Dkt. No. 1: Compl.)  Mezzacappa has moved for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 10: Notice of Motion) and the Commissioner has cross-

moved for judgment on the pleadings (Dkt. No. 14: Gov't Notice of Cross-Motion).  The parties have

consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No.

8.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings is <u>DENIED</u> and Mezzacappa's motion for judgment on the pleadings is <u>GRANTED</u> and

the case is remanded to the Commissioner for further proceedings.

## FACTS

### Procedural Background

On July 23, 2007, Mezzacappa applied for Social Security Disability Insurance Benefits, alleging that he was disabled since January 19, 2007.  (See Dkt. No. 7: Administrative Record Filed by the Comm'r ("R") 76-78.)  In his application, Mezzacappa claimed to suffer from back, knee ("meniscus problem") and right shoulder pain. (R. 93.)  Specifically, Mezzacappa stated that he "can't bend or do much lifting.  [He has] some problems using [his] right arm due to shoulder injury.  Both [his] knees are bad which sometime affects [his] walking."  (R. 93.)

On September 19, 2007, the Social Security Administration ("SSA") conducted an initial review of Mezzacappa's claim and found him not disabled.  (R. 36-40.)  Mezzacappa requested an administrative hearing.  (See R. 44-45.)

Administrative Law Judge ("ALJ") James B. Reap conducted a hearing on October 7, 2008.  (R. 21-35.)  Mezzacappa appeared with counsel.  (R. 21-23.)  On March 19, 2009, ALJ Reap issued a written decision finding that Mezzacappa was not disabled.  (R. 10-20.)  ALJ Reap's decision became the Commissioner's final decision when the Appeals Council denied Mezzacappa's request for review on January 5, 2010.  (R. 1-3.)

The issue before the Court is whether the Commissioner's decision, that Mezzacappa was not disabled between January 19, 2007 and March 19, 2009, is supported by substantial evidence.

**Non-Medical Evidence**

Mezzacappa was born on January 20, 1956 and was fifty-one years old at the alleged onset of his disability.  (R. 23, 76.)  Mezzacappa attended high school through the eighth grade.  (R. 23, 97.)  Between 1979 and January 19, 2007, Mezzacappa worked as a laborer for the New York City Department of Transportation ("DOT").  (R. 24, 94.)  During his twenty-seven years with the DOT, Mezzacappa performed various jobs including paving streets, repairing potholes and operating a jackhammer.  (R. 34, 94.)  Mezzacappa "spent pretty much the whole day" shoveling asphalt or operating the jackhammer.  (R. 34, 94.)  This work required Mezzacappa to regularly lift up to 50 pounds and occasionally lift 100 pounds.  (R. 94-95.)  His job required him to walk seven hours a day and stand for an hour, and also to stoop for six hours.  (R. 94.)  Persistent pain in Mezzacappa's back, knees and shoulder eventually prohibited him from continuing to work, so he retired.  (R. 25, 93.)  He receives a pension of $3,000 a month and also receives Workers' Compensation benefits of $200 a week.  (R. 26-27.)

Mezzacappa wears a brace on his right knee and stated in his disability application that knee pain causes him difficulty bending, lifting, and sometimes walking.  (R. 25, 26, 93.)  Mezzacappa testified that his knees feel "swol[len]" and when he turns, "it feels like it's going to snap." (R. 25.)  Although Workers' Compensation had approved Mezzacappa for right knee surgery on July 26, 2006, he testified at the ALJ's October 7, 2008 hearing that he was still awaiting authorization.  (R. 26, 64-65.)

Mezzacappa described his back as being "shot," and explained that although he had right shoulder surgery in 2003, it was "bothering [him] again."  (R. 25, 33-34.)  According to

4

Mezzacappa, the pain in his back is "constant" and prevents him from getting more than four hours of sleep each night.  (R. 25, 32, 101.)  Mezzacappa does not take anything beyond Tylenol for pain because he does not like "taking any medication."  (R. 29, 34.)  He also noted that he had "not had any testing on either [his] shoulder or [his] back in many years."  (R. 98.)

Mezzacappa lives with his wife and two children, ages thirteen and seventeen.  (R. 26.)  Although he stated in his Social Security Disability Insurance Benefits application that he is able to perform "light household" chores (R. 103), Mezzacappa told the ALJ that he did not "do anything" in the way of house or yard work (R. 30-31).  Mezzacappa passes a typical day mainly "laying down on the couch" and watching sports on television.  (R. 29, 33.)  He testified that he can only walk a block or two.  (R. 30.)  Mezzacappa visits friends' houses about twice a week and recently drove an hour or two, 80 or 90 miles, "[u]pstate" to visit a friend. (R. 27-28, 30, 105.)  Mezzacappa was able to drive himself to the hearing before the ALJ.  (R. 27.)  According to Mezzacappa, he is capable of lifting about five to ten pounds and can sit or stand for about two hours.  (R. 32-33.)

**Medical Evidence:  Treating Physicians**

As ALJ Reap noted, Mezzacappa has a "long history of generally symptomatic treatment with Dr. Richard Memoli and chiropractor Robert Petersen secondary to various work-related injuries." (R. 15.)

Dr. Memoli began treating Mezzacappa in October 1998. (R. 167.) Mezzacappa had injured his right elbow in 1993 while pulling a "power ray box" and complained that he still could

not extend his right arm without "pain" and "some numbness." (R. 167-68.) Dr. Memoli diagnosed

a "ligament sprain," "[a]ggravating [d]eg[enerative] [a]rthritis" and "epicondylitis." (R. 167-68.)

In October 1999, Mezzacappa was injured on the job while pulling a cover over an

asphalt truck. (R. 172.) He reported pain in his right shoulder radiating to the right side of his neck,

"clicking" in his shoulder and "tingling" in his right hand, and that he "cannot lift or carry objects

without pain." (R. 172.) Dr. Memoli diagnosed a ligament sprain in Mezzacappa's right shoulder,

cervical spine strain and "muscle/tendon rupture" of the right rotator cuff. (R. 219.) Dr. Memoli

concluded that Mezzacappa was partially disabled for purposes of Workers' Compensation. (R.

219.) A November 22, 1999 radiologist report found "no fracture or dislocation" of Mezzacappa's

right shoulder. (R. 173.)

Mezzacappa continued to experience pain in his elbow, shoulder and back, and in

February 2000, chiropractor Robert Staropoli concluded that Mezzacappa had a 50-75% permanent

loss of the use of his back. (R. 144.) Nevertheless, Dr. Staropoli concluded that Mezzacappa was

able to work and suggested that Mezzacappa exercise "caution when lifting[,] bending etc." (R.

144.)

In August 2000, Dr. Memoli referred Mezzacappa to physical therapy, and ordered

EMG studies and nerve conduction tests for Mezzacappa's upper extremities, and an MRI for

Mezzacappa's right shoulder. (R. 212.) In December 2000, Dr. Memoli noted that Mezzacappa

continued to experience "persistent right shoulder pain with difficulty lifting and raising" his right

arm. (R. 209.) Dr. Memoli reported that an MRI of Mezzacappa's right shoulder showed

inflammation and impingement syndrome. (R. 209.) Mezzacappa was given an injection of

Celestone in his right shoulder and Dr. Memoli requested authorization for arthroscopic surgery for Mezzacappa's right shoulder.  (R. 209.)

In October 2002, Mezzacappa slipped on oil and fell, injuring his left wrist and right elbow.  (R. 221, 224.)  Dr. Memoli diagnosed a sprain of Mezzacappa's left wrist and thumb and a contusion of his right forearm.  (R. 224.)  Dr. Memoli reported a 30 percent schedule loss to Mezzacappa's left thumb and determined that Mezzacappa was partially disabled for purposes of Workers' Compensation.  (R. 222.)

In January 2003, Mezzacappa underwent surgery for his right shoulder.  (R. 174-75.) On May 5, 2003, four months after the surgery, Dr. Memoli reported that Mezzacappa's right shoulder was "doing well" and noted that Mezzacappa had returned to work four weeks after the surgery.  (R. 192.)  Dr. Memoli reported continued weakness in Mezzacappa's right arm and instructed Mezzacappa to continue physical therapy twice a month.  (R. 192.)

On July 30, 2003, Mezzacappa injured his left knee when stepping down from a truck. (R. 231.) During his August 8, 2003 appointment with Dr. Memoli, Mezzacappa complained of pain in his left knee.  (R. 250.)  Dr. Memoli diagnosed a sprained knee with "internal derangement" and a "probable torn lateral meniscus."  (R. 249-50.) Dr. Memoli requested authorization for an MRI of Mezzacappa's left knee.  (R. 247-50.)  Follow-up examinations in September and December 2003 revealed "no change both in [Mezzacappa's] complaints and physical findings," but Dr. Memoli noted improvement in Mezzacappa's shoulder despite "mild restricted range of motion and clicking." (R. 187, 189.)

A December 4, 2003 MRI of Mezzacappa's left knee showed a "[t]ear of the posterior horn of the medial meniscus." (R. 254.)  On December 30, 2003, Dr. Memoli noted "pain, swelling and buckling of [the] left knee," as well as "restricted range of motion of left knee."  (R. 245.) Dr. Memoli prescribed "physical therapy [two] times weekly" and requesed authorization for "hospitalization and arthroscopic surgery."  (R. 245.)

In February 2005, Mezzacappa returned to Dr. Memoli with "persistent complaints" regarding his left knee.  (R. 235.)  Although Mezzacappa had been approved for surgery (R. 235), by August 2005 he expressed that there had been "mild improvement" and declined the surgery on his left knee (R. 122, 233, 253).

On July 15, 2005, Mezzacappa injured his right knee when he slipped off of a step while climbing onto a truck.  (R. 275.)  Dr. Memoli diagnosed Mezzacappa with a sprain, "internal derangement" of his right knee and a "prob[able] torn medial meniscus."  (R. 275-76.)  Dr. Memoli described Mezzacappa as "totally disabled" for purposes of Workers' Compensation and ordered an MRI of Mezzacappa's right knee.  (R. 276.)  At a November 1, 2005 follow-up visit, Dr. Memoli noted that Mezzacappa's right knee "lack[ed] 20 degrees flexion" and that he experienced "persistent pain, swelling and buckling of the right knee."  (R. 274.)  Dr. Memoli also reported "pain [at the] medial joint line" and an "equivocal positive McMurray sign."  (R. 274.)  Nevertheless, Mezzacappa had returned to work and Dr Memoli deemed him only partially disabled for Workers' Compensation purposes. (R. 273-74.)

On March 28, 2006, Mezzacappa returned to Dr. Memoli with "persistent pain, swelling and buckling of the right knee."  (R. 272.)  Dr. Memoli again noted that the knee "lack[ed]

8

20 degrees flexion" and again reported pain at the medial joint line and  an "equivocal positive McMurray sign." (R. 272.) An April 19, 2006 MRI revealed a medial meniscal tear of the right knee (R. 258), leading Dr. Memoli on May 1, 2006 to request authorization for arthroscopic surgery of Mezzacappa's right knee  (R. 270).

On July 11, 2006, in connection with Mezzacappa's Workers' Compensation claim, Dr. Jerome Moga performed an independent orthopedic evaluation of Mezzacappa's right knee.  (R. 122-23.)  Dr. Moga found "no right knee ligament laxity or joint effusion," "no localizing tenderness," and "no crepitus with right knee range of motion," but noted "moderately decreased distal right thigh muscle tone and size to palpation." (R. 122-23.)  Dr. Moga concluded that since Mezzacappa was "continuing to perform full duty regular work at this time, it is not felt that he has any ca[us]ally related disability at this time." (R. 123.)  Nevertheless, in light of Mezzacappa's "right knee symptoms" and "the results of the MRI" examination,  Dr. Moga recommended arthroscopic surgery.  (R. 123.)  Workers' Compensation authorized right knee surgery on August 1, 2006.  (R. 64-65.)

Dr. Memoli continued to see Mezzacappa  for his right knee in August and October 2006 and April, July and September 2007.  (R. 121, 259-64, 279.)  During these visits, Mezzacappa continued to exhibit the same symptoms: "persistent pain in the right knee" with "continued swelling and buckling," "moderate swelling and pain [at the] medial joint line with equivocal positive McMurray sign."  (R. 121, 259-64, 279.)[1]  Dr. Memoli's notes indicate that Mezzacappa "had to

---

[1]    During this period, Dr. Memoli's notes continue to request authorization for "hospitalization and arthroscopic surgery" (R. 121, 260, 262, 264) despite authorization having been granted
(continued...)

9

retire in January of 2007 because of a combination of all his workman's compensation injuries, as [Mezzacappa] was unable to do his job." (R. 260, 262.)

On August 13, 2007, the Social Security Administration ("SSA") sent Dr. Memoli a form seeking his evaluation of Mezzacappa's residual functional capacity. (R. 159-66, 288.) Although the SSA followed up with Dr. Memoli in August and September 2007, Dr. Memoli did not complete the form. (R. 288-91.) The SSA also sent the disability evaluation form to Mezzacappa's chiropractor, Dr. Robert Petersen, who did complete the form on August 17, 2007. (R. 135-42, 288.) Dr. Petersen diagnosed lower back pain with sciatica and neuralgia of the right leg and "multiple vertebral subluxations of the lumbo-sacral spine." (R. 136.) He indicated that Mezzacappa's present symptoms included "lower back pain" and "sciatica (right leg)." (R. 136.) Dr. Petersen could not provide a medical opinion regarding Mezzacappa's ability to perform work-related activities because he "[does] not perform disability assessments." (R. 139-40.) Instead, he recommended that Mezzacappa be evaluated orthopedically. (R. 140.)

**Medical Evidence:  Consultative Examination**

On August 21, 2007, Dr. Rose Chan performed an independent consultative examination of Mezzacappa. (R. 146-49.) Dr. Chan stated that Mezzacappa "has numerous complaints including back pain, bilateral knee pain, and right shoulder pain, of which he says his chief complaint is low back pain." (R. 146.) Mezzacappa reported "low back pain since about 1993," which is "constant" but also "increases with lifting and reduces with rest." (R. 146.)

---

[1]/        (...continued)
          on August 1, 2006 (R. 64-65).

Mezzacappa stated that he was still awaiting Workers' Compensation approval for right knee surgery, and that the right knee pain is "intermittent and increases with bending, reduces with rest." (R. 146.) He complains of "intermittent pain in his right shoulder 'every now and then.'"  (R. 146.)

Dr. Chan noted that Mezzacappa "appeared to be in no acute distress," had a normal gait and station, could "walk ten blocks and climb two flights of stairs to the second or the third floor," and could "walk on heels and toes without difficulty."  (R. 146-47.)  Dr. Chan observed that Mezzacappa could perform a full squat, "[n]eeded no help changing for the exam or getting on and off [the] exam table" and was "[a]ble to rise from [a] chair without difficulty."  (R. 147.) Mezzacappa's hand and finger dexterity were intact with a grip strength of 5/5 bilaterally.  (R. 147.) Mezzacappa had "[f]ull flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally" in his neck with "[n]o cervical or paracervical pain or spasm," and "[n]o trigger points." (R. 147.)

Dr. Chan reported a full range of motion in Mezzacappa's shoulders, elbows, forearms, wrists and fingers bilaterally.  (R. 147.)  There was "[n]o joint inflammation, effusion, or instability."  (R. 147-48.)  Mezzacappa's proximal and distal muscle strength was evaluated at 5/5. (R. 148.)  He had no "muscle atrophy" or "sensory abnormality."  (R. 148.)  Dr. Chan took note of Mezzacappa's muscularity and found his reflexes to be "physiologic and equal."  (R. 148).

Dr. Chan's examination of Mezzacappa's thoracic and lumbar spine revealed "[f]ull flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally."  (R. 148.)  Dr. Chan found "[n]o spinal or paraspinal tenderness," "[n]o SI joint or sciatic notch tenderness," "[n]o spasm," "[n]o scoliosis or kyphosis," and "[n]o trigger points."  (R. 148.)

Finally, Dr. Chan found that Mezzacappa had a full range of motion of his hips, knees and ankles, bilaterally with a strength of 5/5 in his proximal and distal muscles bilaterally. (R. 148.)  Dr. Chan observed no muscle atrophy or sensory abnormality and "[n]o joint effusion, inflammation, or instability."  (R. 148.)  Mezzacappa's reflexes on his lower extremities were "physiologic and equal." (R. 148.)  An x-ray of the lumbosacral spine showed disc space narrowing and straightening of the lordotic curve. (R. 148, 150.) An x-ray of the right knee was unremarkable. (R. 148, 150.) Dr. Chan diagnosed polyarthralgia and chronic low back pain. (R.  148.)  Based on the objective findings of her evaluation, Dr. Chan concluded that Mezzacappa had "[n]o limitations." (R. 148.)

**The ALJ's Decision**

In a written decision dated March 19, 2009, ALJ Reap denied Mezzacappa's application for Disability Insurance Benefits for the period from January 19, 2007 to March 19, 2009. (R. 11-20.)

ALJ Reap reviewed Mezzacappa's claim of back, knee and right shoulder pain, considering both Mezzacappa's testimony and the medical records. (R. 15-18.) ALJ Reap concluded that Mezzacappa suffered from "osteoarthritis, status-post right shoulder arthroscopic surgery, and a history of bilateral meniscal tears" to his knees.  (R. 17.)  Although Mezzacappa's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," ALJ Reap found that Mezzacappa's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible."  (R. 18.)

ALJ Reap applied the appropriate five step legal analysis as follows: At the first step, ALJ Reap found that Mezzacappa had not "engaged in substantial gainful activity since January 19, 2007, the alleged onset date." (R. 17.) At the second step, ALJ Reap found that Mezzacappa had "the following severe impairments: osteoarthritis, status-post right shoulder arthroscopic surgery, and a history of bilateral meniscal tears." (R. 17.) At the third step, ALJ Reap found that Mezzacappa's impairments do not "meet[] or medically equal[]" one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. 17.) At the fourth step, ALJ Reap noted the "conservative and purely symptomatic medical treatment" given to Mezzacappa. (R. 18.) The "objective medical evidence fails to substantiate [Mezzacappa's] contentions of total disability." (R. 18.) Mezzacappa's daily activities "supports the finding [that he is able] to perform light work." (R. 18.) ALJ Reap also noted that Mezzacappa was receiving approximately $46,000 in pension and Workers' Compensation benefits, and his wife also earned income, so that Mezzacappa has "an income stream which does not necessitate [his] return to the active workforce." (R. 18.) ALJ Reap determined that Mezzacappa has the residual functional capacity to "lift/carry objects that weigh up to 20 pounds occasionally, and 10 pounds frequently" and that "[d]uring the course of an 8-hour workday, he is able to meet all the other exertional demands of light work, including sitting for a total of 6 hours; standing for a total of 6 hours; and walking for a total of 6 hours." (R. 17.) Accordingly, ALJ Reap found that Mezzacappa had "the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)." (R. 17.) Because Mezzacappa's "past relevant work" as a "road construction/maintenance worker" required "exertional demands which

well exceed the parameters of light work," ALJ Reap found that it exceeded Mezzacappa's residual functional capacity.  (R. 19.)

At the fifth and final step, ALJ Reap utilized the Grid and concluded that based on Mezzacappa's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform."  (R. 19.)  Accordingly, ALJ Reap found that Mezzacappa was "not disabled" from January 19, 2007 to March 19, 2009.  (R. 19.)

## ANALYSIS

## I.    STANDARD OF REVIEW

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 110 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); 42 U.S.C. § 405(g).[2/]  "'Thus, the role of the district

---

[2/]    See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"

Morris v. Barnhardt, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[3/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[4/]   "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."   Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).   The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[5/]   However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7

---

[3/]   See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (quotations & alterations omitted).

[4/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[5/]   See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

(S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

      The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[6] accord, e.g., Salmini v. Comm'r of Soc. Sec., 317 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[7]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[8]

---

[6]   Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156.

[7]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[8]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

A.      **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[9]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be

---

[9]      See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

18

significant.  20 C.F.R. § 404.1527(d)(2); see, e.g., Gunter v. Comm'r of Soc. Sec., No. 08-5544-cv, 2010 WL 145273 at *1 (2d Cir. Jan. 15, 2010); Foxman v. Barnhart, 157 F. App'x at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[10/]

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

**B.     The ALJ's Duty to Develop the Record**

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [cert. denied, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), reh'g granted in part and denied in part, 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant).  Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).  "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[11/]

---

[10/]   See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

[11/]   See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416912(d), (continued...)

## II.     APPLICATION OF THE FIVE STEP SEQUENCE TO MEZZACAPPA'S CLAIMS

### A.     Mezzacappa Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Mezzacappa was engaged in substantial gainful activity after his applications for Disability Insurance Benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  ALJ Reap's conclusion that Mezzacappa had not engaged in substantial gainful activity during the applicable time period (see page 12 above) is not disputed.  The Court therefore proceeds to the second step of the five part analysis.

### B.     Mezzacappa Demonstrated "Severe" Physical and Mental Impairments That Significantly Limited His Ability To Do Basic Work Activities

The next step of the analysis is to determine whether Mezzacappa proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

---

[11]/     (...continued)
416.912(e)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of H.H.S., 685 F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

20 C.F.R. § 404.1521(b)(1)-(5).  The Second Circuit has warned that the step two analysis may not do more than "screen out <u>de minimis</u> claims." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." <u>Rosario</u> v. <u>Apfel</u>, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the <u>de minimis</u> level, then the further analysis of step three and beyond must be undertaken.  <u>See</u>, <u>e.g.</u>, <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" <u>Rosario</u> v. <u>Apfel</u>, 1999 WL 294727 at *5 (quoting <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Reap determined that the medical evidence indicated that Mezzacappa's "osteoarthritis, status-post right shoulder arthroscopic surgery, and a history of bilateral meniscal tears" of both knees were severe within the meaning of 20 C.F.R. § 404.1520(c).  (<u>See</u> page 12 above).  These findings are not disputed.  The Court therefore proceeds to the third step of the five part analysis.

**C.  <u>Mezzacappa Did Not Have A Disability Listed in Appendix 1 of the Regulations</u>**

The third step of the five-part test requires a determination of whether Mezzacappa had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is

conclusively presumed to be disabled and entitled to benefits." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

Based on the medical record, ALJ Reap correctly determined that Mezzacappa suffered from "osteoarthritis, status-post right shoulder arthroscopic surgery, and a history of bilateral meniscal tears." (<u>See</u> page 12 above.)  ALJ Reap found, however, that while Mezzacappa's medically determinable impairments were "severe," Mezzacappa did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 17; <u>see</u> page 12 above.)  The medical evidence supports that finding, which is not disputed.  (<u>See</u> Dkt. No. 11: Mezzacappa Br. at 3.)

**D.      Mezzacappa Did Not Have the Ability to Perform His Past Work**

The fourth prong of the five part analysis is whether Mezzacappa had the residual functional capacity to perform his past relevant work.  (<u>See</u> page 15 above.)  Because Mezzacappa's past work as a highway repairman is "generally performed at the very heavy exertional level within the national economy," ALJ Reap concluded that Mezzacappa was "unable to engage in his past relevant work, either as this job was actually performed, or as it is generally performed within the national economy." (R. 19.)   This finding is not disputed, and the Court proceeds to the fifth and final step of the analysis, and the only step on which the parties disagree.

**E.      There Was Insufficient Evidence to Support the ALJ's Finding That Mezzacappa Can Perform "Light" Work In The Economy**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980); see, e.g., Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v.

Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005);

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

> In meeting his burden under the fifth step, the Commissioner ordinarily will make use

of the "Grid":

> > In meeting [his] burden of proof on the fifth step of the sequential evaluation process
> > described above, the Commissioner, under appropriate circumstances, may rely on
> > the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App.
> > 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's
> > residual functional capacity in conjunction with the claimant's age, education and
> > work experience.  Based on these factors, the Grid indicates whether the claimant can
> > engage in any other substantial gainful work which exists in the national economy.
> > Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fns. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan,

168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604

(2d Cir. 1986).  "The Grid classifies work into five categories based on the exertional requirements

of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very

heavy, based on the extent of requirements in the primary strength activities of sitting, standing,

walking, lifting, carrying, pushing, and pulling."  Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20

C.F.R. § 404.1567(a).  Taking account of the claimant's residual functional capacity, age, education,

and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R.

§ 404.1569 & Subpt. P, App. 2, 200.00(a).

ALJ Reap determined that Mezzacappa had the residual functional capacity to perform light work.  (R. 17, 19.)[12]  Specifically, ALJ Reap determined that Mezzacappa could "lift/carry objects that weigh up to 20 pounds occasionally, and 10 pounds frequently" and could "meet all the other exertional demands of light work, including sitting for a total of 6 hours; standing for a total of 6 hours; and walking for a total of 6 hours."  (See page 12 above.)  The record evidence does not support this finding.

Mezzacappa's treating physician Dr. Memoli chronicled Mezzacappa's long history of knee, shoulder and back pain from work injuries.  (See pages 4-9 above.)  Specifically focusing on Mezzacappa's knees, Dr. Memoli diagnosed a torn miniscus of both knees and found him totally or partially disabled for Workers' Compensation purposes. (See pages 5-7 above.)  Dr. Memoli also

---

[12]      Light work entails

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  Sedentary work entails

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

prescribed a knee brace and repeatedly requested arthroscopic surgery for both of Mezzacappa's knees.  (R. 235, 237, 239, 241, 243, 245, 260, 262, 264, 266, 268, 270, 297.)  Consultative physician Dr. Moga agreed that "right knee arthroscopic surgery as advised by Dr. Memoli is indicated at this time" in 2006.  (R. 123.)  Dr. Memoli also stated in April, July and September 2007 that Mezzacappa "had to retire" because of his injuries.  (<u>See</u> pages 8-9 above.)  Unfortunately, Dr. Memoli failed to complete a residual functional capacity assessment for Mezzacappa.  (<u>See</u> page 9 above.)

As noted above, an ALJ has an affirmative obligation to develop the administrative record, even when the claimant is represented by counsel.  (<u>See</u> Point I.C above & cases cited therein.)  Moreover, "[t]he ALJ's responsibility to help a claimant obtain complete medical records dovetails with the treating physician rule . . . .  The combination of these two principles, 'compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . .'"  <u>Oliveras</u> v. <u>Astrue</u>, 07 Civ. 2841, 2008 WL 2262618 at *6 (S.D.N.Y. May 30, 2008), <u>report & rec. adopted</u>, 2008 WL 2540816 (S.D.N.Y. June 25, 2008).  Although the SSA twice attempted to contact Dr. Memoli so that he could provide a residual functional capacity analysis of Mezzacappa, that did not absolve the ALJ of his responsibility to follow up with Dr. Memoli.  <u>See</u> 20 C.F.R. § 404.1512(e)-(e)(1) ("When the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information . . . . [w]e will seek additional evidence or clarification from your medical source when . . . the report does not contain all the necessary information . . . ."); <u>Oliveras</u> v. <u>Astrue</u>, 2008 WL 2262618 at *6 ("The SSA is required to make 'every reasonable effort' to obtain a claimant's

treating physician's medical reports. . . . This means that the ALJ should make an initial request from the claimant's treating physician for records, plus one follow-up request, . . . and if the documents received lack any necessary information, the ALJ should recontact the treating physician.").  In addition, in appropriate cases – such as this – the ALJ should inform the claimant and claimant's counsel of the inability to obtain necessary medical information from the treating physician, to allow the claimant to obtain that information.  E.g., Oliveras v. Astrue, 2008 WL 2262618 at *6 ("At times it may be most reasonable for the ALJ to explain to the claimant that she should obtain a more detailed statement from the treating physician.  It might also be reasonable for the ALJ to reveal that he or she plans to rule against the claimant unless more evidence is presented.") (citations omitted).  Unfortunately, ALJ Reap did not do that here, and did not obtain Dr. Memoli's opinion as to Mezzacappa's residual functional capacity.  ALJ Reap thus failed to fully develop the record, requiring a remand.  See, e.g., Oliveras v. Astrue, 2008 WL 2262618 at *7 ("Remand is appropriate here . . . so that the ALJ can make all reasonable efforts to obtain a treating physician's opinion on [the claimant's] behavior and functional capacity."); Jimenez v. Massanari, 00 Civ. 8957, 2001 WL 935521 at *11 (S.D.N.Y. Aug. 16, 2001) (Peck, M.J.) ("The ALJ has a duty to aid the claimant in obtaining important evidence such as a treating physician's assessment of a claimant's functional capacity.") (citing cases); Vaughn v. Apfel, 98 Civ. 0025, 1998 WL 856106 at *7 (S.D.N.Y. Dec. 10, 1998) ("The problem here however is that the ALJ did not specifically request the [treating] doctor's opinion as to the plaintiff's claimed disabilities despite the fact that the treating physician's opinion is all but controlling in social security cases.") (citation omitted), amended on other grounds, 1999 WL 314163 (S.D.N.Y. May 18, 1999); Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)

("It is the opinion of the treating physician that is to be sought; it is his opinion as to the existence and severity of a disability that is to be given deference. . . . [While the] ALJ obtained voluminous records from these doctors," the ALJ did not obtain their opinions.). For this reason alone, a remand is appropriate. E.g., Rosa v. Apfel, 97 Civ. 5831, 1998 WL 437172 at *4-5 (S.D.N.Y. July 31, 1998) (remanding for development of the record where plaintiff's long-time treating physician "did not fill out the section of the form relating to plaintiff's residual functional capacity").

Mezzacappa's own testimony also cuts against the ALJ's decision. Mezzacappa complained of pain in both knees and testified before the ALJ that he was limited in walking and standing; Mezzacappa told ALJ Reap that he could only walk a block or two. (See page 4 above.) Mezzacappa also told the ALJ that his back was "shot" (see page 3 above) and that back pain prevents him from getting more than four hours of sleep a night (see page 4 above). Further, Mezzacappa testified that his knee feels "swol[len]" and that when he turns, "it feels like it's going to snap." (See page 3 above.)

Because subjective symptoms like pain only lessen a claimant's residual functional capacity where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings."); Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x

842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was

at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177

F.3d 128, 135 (2d Cir. 1999).[13]

The ALJ may have correctly considered Mezzacappa's subjective claims of pain

exaggerated, but the ALJ erred in totally discounting them in light of the medical evidence,

especially as to Mezzacappa's knees.  Dr. Memoli's reports chronicle a long history of "pain, swelling

and buckling" in both of Mezzacappa's knees.  (R. 235, 237, 239, 241, 243, 245, 248, 260, 262, 264,

266, 268, 270, 272, 274, 297.)  Based on the information from treating physician Dr. Memoli and

Mezzacappa's statements as to his limitations in standing/walking, this Court does not find ALJ

Reap's conclusion that Mezzacappa had the residual functional capacity to stand, sit and walk for six

hours in an eight hour workday to be supported by substantial evidence.[14]

---

[13]    See also, e.g., Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y.
Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were
not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL
818004 at *11 (E.D.N.Y. Mar. 26,  2008) ("The ALJ 'does not have to accept plaintiff's
subjective testimony about her symptoms without question' and should determine a plaintiff's
credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL
31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to
evaluate the credibility of a claimant and to arrive at an independent judgment, in light of
medical findings and other evidence, regarding the true extent of pain alleged by the
claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[14]    While Mezzacappa testified at the hearing that pain in both knees, among other things,
prevented him from working, he declined surgery for the left knee in 2005, citing "mild
improvement." (See pages 3, 7 above.)  Even crediting Mezzacappa's testimony that he was
unaware surgery had been approved for his right knee in 2006, the record contains no
indication that Mezzacappa, his doctor or his counsel ever attempted to follow up with
Workers' Compensation regarding authorization for surgery.  Mezzacappa has also
consistently declined pain medication and only occasionally takes Tylenol for pain.  (See
page 4 above.)  "If [a claimant] do[es] not follow the prescribed treatment without a good
                                                                              (continued...)

Thus, while the "grid" would find a worker "closely approaching advanced age" with less than a high school education who can perform light work is not disabled, 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.11-.12, the finding that Mezzacappa can do light work is not supported by substantial evidence.[15/]  See, e.g., Colon v. Astrue, No. 09-CV-6527, 2010 WL 2925969 at *2-3 (W.D.N.Y. July 23, 2010) (remanding for development of the record where ALJ's determination that plaintiff was able to perform full range of sedentary work was contradicted by plaintiff's testimony that he was illiterate and unsupported by evidence of any formal literacy testing in the record); Montano v. Barnhart, 01 Civ. 10710, 2003 WL 749527 at *6 (S.D.N.Y. Mar. 5, 2003) (the grid cannot be applied where the record is inconclusive as to the level of plaintiff's transferable skills and where resolution of this issue is decisive on the question of disability); cases cited at pages 24-25 above.

---

[14/]    (...continued)
reason, [the SSA] will not find [him] disabled . . . ."  20 C.F.R. § 404.1530(b).  See, e.g., Hussnatter v. Astrue, No. CV-09-3261, 2010 WL 3394088 at *22 (E.D.N.Y. Aug. 20, 2010) ("in order to be entitled to DI benefits or SSI, the claimant is required to follow all prescribed treatment if such treatment can restore his or her ability to work."); but cf. Pimenta v. Barnhart, 05 Civ. 5698, 2006 WL 2356145 at *6 (S.D.N.Y. Aug. 14, 2006) (A "claimant's decision not to undergo a corrective process is not sufficient grounds to deny disability when there is a good reason for the refusal. . . . '[A] full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable.'") (quoting SSR 82-59, 1982 WL 31384 at *4); McFadden v. Barnhart, 94 Civ. 8734, 2003 WL 1483444 at *8 (S.D.N.Y. Mar. 21, 2003) ("a claimant may only be denied disability benefits if the Secretary finds that she unjustifiably failed to follow prescribed treatment and that if she had followed the treatment, she would not be disabled under the Act.").  The ALJ is free to consider this issue on remand.

[15/]    The Court notes that while Mezzacappa perhaps has the capacity to perform sedentary jobs where he would not have to stand or walk much, under the grid, someone closely approaching advanced age with less than high school education and unskilled or without transferable skills who only can do sedentary work is considered disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.09-.10.

## **CONCLUSION**

For the reasons set forth above, the Commissioner's determination that Mezzacappa

was not disabled within the meaning of the Social Security Act during the period January 19, 2007

through March 19, 2009, is not supported by substantial evidence. The Commissioner's motion for

judgment on the pleadings (Dkt. No. 14) therefore is DENIED and Mezzacappa's motion for

judgment on the pleadings (Dkt. No. 10) is GRANTED and the case remanded to the Commissioner

for further proceedings consistent with this Opinion. The Clerk of Court shall enter judgment

accordingly.

SO ORDERED

Dated:        New York, New York
              November 5, 2010

                                        Andrew J. Peck
                                        United States Magistrate Judge

Copies **by ECF** to:    Barry I. Weiss, Esq.
                         A.U.S.A. Susan D. Baird, Esq.

G:\OPIN\MEZZACAPPA